**IN THE UNITED STATE DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

FILED

JAN 16 2024

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

Justin Hughes          :
PO Box 470039          :          CASE NO. _____
Broadview Heights, OH 44147   :
PLAINTIFF              :          **1:24 CV 00093**
                      :
                      :          **JUDGE RUIZ**
        VS.           :
                      :          PRO SE COMPLAINT
                      :
                      :          **MAG. JUDGE GREENBERG**
University Hospitals
11100 Euclid Avenue              **JURY TRIAL DEMANDED**
Cleveland, Ohio
DEFENDANT

Governor Mike DeWine          Riley Grosso ("Dr. Grosso)
Riffe Center, 30th Floor,     (Address unknown)
77 South High Street          DEFENDANT
Columbus, OH 43215-6117
DEFENDANT

Anupam Jha (Dr. Jha)          Irene Fries
(Address unknown)             (Address unknown)
DEFENDANT                     DEFENDANT

Deb Gedridge                  Bryon Harrell ("Mr. Harrell)
(Address unknown)             (Address unknown)
DEFENDANT                     DEFENDANT

Director LeeAnne Cornyn
ODMHAS
30 East Broad Street, 36th Floor
Columbus, Ohio 43215-3430
DEFENDANT

1

## STATEMENT OF JURISDICTION AND VENUE

This Court has jurisdiction over claims asserted in this action pursuant to 28 U.S.C. § 1331, which grants federal question jurisdiction for claims arising under the United States Constitution and Federal Statutes.

This Court has jurisdiction over claims asserted in this action pursuant to 28 U.S.C. § 1343, which grants jurisdiction over civil rights claims arising under 42 U.S.C. § 1983.

Pursuant to 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over all state law claims related to the federal claims because they form part of the same case or controversy under Article III of the United States Constitution.

Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because all of the events or omissions giving rise to the claim occurred within this judicial district.

Additionally, University Hospitals Cleveland Medical Center, a named defendant in this action, has its principal place of business within this district, making it a resident of this district for venue purposes.

## PRO SE COMPLAINT

I respectfully request this honorable court to liberally construe my claims, taking into consideration my status as a pro se plaintiff and my ongoing struggle with symptoms of mental illness. My search for representation was unfruitful, and so I seek the court's understanding and patience in reviewing my verbose complaint in order to ensure that my claims are heard on their merits.

## HISTORICAL BACKGROUND

1. The Ohio General Assembly first expressed an affirmative commitment to the care of mentally ill people in the state when it passed Ohio's first "mental health" law in 1815.

2. The law passed in 1815 allowed justices of the peace to issue orders to confine any individual unanimously found to be "an idiot, non-compos, lunatic or insane" by a jury of seven men.

3. The Ohio General Assembly's affirmative commitment to the mentally ill of the state was converted to a government function upon the passage of Article VII, Section 1 of the Ohio Constitution in 1851.

4. Article VII, Section 1 states, "Institutions for the benefit of the insane, blind, deaf and dumb, shall always be fostered and supported by the state; and be subject to such regulations as may be prescribed by the General Assembly."

5. In furtherance of its responsibility, the Ohio General Assembly has passed the modern provisions of O.R.C. Chapter 5122 to regulate all mental health institutions operating within the State.

6. O.R.C. Chapter 5122 has created three inpatient hospitalization procedures and has prescribed mandatory courses of action that apply to all actors, whether public or private in their execution of the procedures.

7. The three procedures are: voluntary hospitalization as defined by O.R.C. § 5122.02, judicial hospitalization as defined by O.R.C. § 5122.11, and emergency hospitalization as defined by O.R.C. § 5122.10.

8. Voluntary hospitalization procedures give Ohio hospitals the power to admit adult patients who, believing themselves to be mentally ill, voluntarily draft and submit a written application requesting the chief medical officer of a psychiatric hospital to admit them for observation, diagnosis, care, or treatment.[1]

9. Judicial hospitalization procedures give Ohio courts the power to review affidavits of mental illness and accompanying statements to determine whether probable cause exists to justify the court's issuance of an "order of detention" allowing for the civil arrest and hospitalization of an alleged mentally ill person for the purposes of observation and treatment.[2]

10. Finally, emergency hospitalization procedures give a delineated class of state-defined actors the power to civilly arrest, transport, and compel an individual suspected of being mentally ill to submit to a mental health examination by executing a written statement affirming the class member has reason to believe the individual is subject to immediate hospitalization, without the benefit of a judicial hearing or review, because he represents a substantial risk of harm to himself or others if allowed to remain at liberty.

11. Emergency hospitalization procedures are the focus of this case and are detailed in the next section.

---

[1] The State of Ohio does not publish a standard "voluntary application" form to facilitate the admission process. Additionally, it is relevant to note that voluntary patients are compelled to participate in a state-defined discharge process, which can take up to three days to complete under O.R.C. § 5122.03.

[2] The "affidavit of mental illness" a standardized form published by the Ohio General Assembly in O.R.C. § 5122.111 and allows anyone to assert, under oath, reliable or known details sufficient to substantiate the individual is a mentally ill person subject to court-ordered hospitalization because he meets the criteria of O.R.C Section 5122.01(B) and refuses to voluntarily seek treatment. While private citizens may participate in this process, the power behind the process comes from the court through the "order of detention."

## EMERGENCY HOSPITALIZATION

12. O.R.C. § 5122.10 outlines mandatory rules for the immediate hospitalization of individuals who pose a substantial risk to themselves or others due to their mental illness.

13. If the harm to be prevented by immediate hospitalization is self-harm, then the State has justified action taken under O.R.C. § 5122.10 by asserting its inherent authority to protect persons who are legally unable to act on their own behalf, acting in accordance with its parens patriae powers.

14. If the harm to be prevented by immediate hospitalization is harm to others, then the State has justified action taken under O.R.C. § 5122.10 by asserting its inherent authority to regulate and promote the health, safety, and welfare of its residents, acting in accordance with its general police powers.

15. Under either theory, the ability to act stems from a power traditionally exclusive to the State, and when a state-defined actor engages in emergency hospitalization procedures, their legal authority is properly traced back to the State's parens patriae or general police powers.

16. O.R.C. § 5122.10(A) identifies the state-defined group of actors authorized to invoke State powers in the context of emergency hospitalization, and that list consists of public employees and state-licensed healthcare professionals.

17. Nonetheless, the ability of a state-defined actor to properly clothe himself in the color of law is not absolute, as it requires the law to be properly invoked and its statutory requirements observed.

18. For emergency hospitalization procedures, proper invocation of authority under O.R.C. § 5122.10 requires the execution of a valid 'written statement,' which is essentially a civil arrest warrant used to seize a person suspected of being a 'mentally ill person subject to hospitalization,' an arrestable offense under O.R.C. 5122.10.[3]

19. A valid written statement <u>must</u> comply with the following requirements according to the statutory framework:

---

[3] The requirement of a valid written statement is also required to ensure minimal due process protections for the mentally ill who are not protected by self-determination under O.R.C. § 5122.02 or judicial proceedings under O.R.C. § 5122.11.

20. The written statement must provide facts about the circumstances under which the individual was taken into custody.

21. The written statement must provide facts sufficient to substantiate probable cause exists to support the belief that the individual is a mentally ill person, as defined by O.R.C Section 5122.01(A).

22. The written statement must provide facts sufficient to substantiate that probable cause exists to support the belief that the individual is subject to court order, as defined by O.R.C Section 5122.01(B).

23. The written statement must provide facts sufficient to substantiate that probable cause exists to support the belief that the individual represents a substantial risk of physical harm to himself or others if allowed to remain at liberty pending examination.

24. The written statement must be provided to the hospital by an authorized actor, as defined by O.R.C Section 5122.10(A)(1).

25. If an authorized state-defined actor successfully invokes the law by executing and delivering a valid written statement, then the actor is granted actual authority to act under the color of law to take the suspect into custody and immediately transport him to a hospital for a compelled psychiatric examination pursuant to O.R.C Section 5122.10(A)(1).

26. However, the statutory framework also specifies what must happen after the suspect is taken into custody.

27. According to O.R.C. 5122(E), a mental health examination of the suspect must be completed within twenty-four hours after arrival at the hospital, and if the examination requires the patient to stay overnight, the suspect must be admitted under an unclassified status until a disposition is reached regarding the patient's legal status.

28. Following the mandated examination, the statutory framework requires the hospital's chief clinical officer to issue a ruling on the suspect's legal status, which then determines the mandatory course of action required by the law.

29. If the chief clinical officer considers the available evidence and believes the suspect does not meet the legal definitions of 'a mentally ill person subject to court order,' then the chief clinical officer is obligated under the law to immediately release the suspect, in accordance with O.R.C Section 5122.10(E).

30. If the chief clinical officer considers the available evidence and believes the suspect does meet the legal definitions of 'a mentally ill person subject to court order,' then the chief clinical officer can either admit the suspect as a voluntary patient and detain the patient for up to three days or file an affidavit under O.R.C Section 5122.11 to seek an order of detention by a court.

## STATEMENT OF FACTS

31. On January 15, 2023, I voluntarily went to the University Hospital emergency room located at 11100 Euclid Avenue Cleveland, OH 44106 to seek medical treatment and a mental health evaluation.

32. The medical treatment I was seeking was related to my chronic pain, muscle spasms, and insomnia—three issues that had been causing me a great deal of distress.

33. Earlier that day, I spoke with my pain management doctor (Dr. Kanazi) about my situation, but he directed me to contact the on-call pain management doctor because he was in Las Vegas at a medical conference.

34. The on-call pain management doctor spoke to me at-length about my situation and suggested an antispastic, such as a benzodiazepine, could be helpful in relieving my muscle spasms and recommended that I report to the emergency department to be examined and treated for my pain.

35. I had recently been prescribed an oral steroid for my neck that had caused my insomnia, and I was concerned that I might be experiencing a "manic episode" as a side effect from the drug, so I requested a mental health exam just to be safe.

36. The mental health assessment that I requested and voluntarily participated in consisted of a series of assessments related to my mental health and revealed the following:

37. I was appropriately groomed, dressed in pajamas, and I appeared to be my stated age.

38. My attitude was calm and cooperative, and I maintained appropriate eye contact during the exam.

39. My speech was regular in rate, rhythm, volume, and tone, and I communicated spontaneously and fluently.

40. My mood was congruent and my affect was appropriate with a full range.

41. My cognition was noted as alert and oriented in all three spheres (person, place, time), with no deficits in memory, attention, concentration, or language.

42. My thought process was described as "organized, linear, and goal directed" with logical associations.

43. I did not endorse auditory or visual hallucinations, and did not appear to be responding to hallucinatory stimuli.

44. I was negative for symptoms of delirium, psychosis, and mania.

45. It was noted that my thought content did "endorse suicide ideation," but the thoughts were described as "persistent thoughts of death" and "a passive death wish."

46. My thoughts around death were also noted to be attributed to "chronic pain and sleep deprivation," motivated by wanting to "end or stop the pain" related to my physical condition, and I lacked "a plan or intent" related to suicide.

47. "Denies" was the response recorded when evaluating my "history of self-harming behaviors."

48. I answered "No" when asked "In your lifetime, have you ever done anything, started to do anything, or prepared to do anything to end your life?

49. My risk of suicide according to the Columbia Suicide Severity Rating Scale (C-SSRS) was recorded as "moderate."[4]

50. Finally, my "insight" was described as "good," and it was recorded that my judgement indicated that I could make "reasonable decisions about ordinary activities of daily living and necessary medical care recommendations."

51. In spite of that exam, on January 15, 2023 at 10:59 AM, a written statement was drafted against me that alleged "Patient is displaying bizarre behavior with some internal stimulation and endorsing suicidal ideation with a history of prior attempts."

52. The written statement also presented the follow assertions as true:

53. I was a "mentally ill person" under Ohio law.

---

[4] I assert this test was not properly administered, and the true score was "mild" or "low." See Exhibit A

54. I was subject to hospitalization by court order because I represented a substantial risk of physical harm to myself as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm

55. I was subject to hospitalization by court order because I represented a substantial and immediate risk of serious physical impairment or injury to self as manifested by evidence that I was unable to provide for and was not providing for my basic physical needs because of my mental illness, and appropriate provision for my basic physical needs could not be made immediately available in the community.

56. I would benefit from treatment in a hospital for my mental illness and was in need of such treatment as manifested by evidence of behavior that created a grave and imminent risk to substantial rights of others or myself.

57. And finally, I represented a substantial risk of physical harm to myself or others if allowed to remain at liberty pending examination.

58. I believe this written statement was improper for the following reasons:

59. The assertions were neither true nor based on reliable information.

60. Neither signatory to the written statement was materially involved in my care.

61. The statement provides no facts to substantiate its claims.

62. It was drafted by Mr. Harrell, a physician's assistant who did not have the authority to invoke O.R.C. § 5122.10 procedures.

63. The physician, Dr. Grosso, who executed the document did not sign it until January 18, 2023—a full three days after my transfer, which prevented it from being timely executed.

64. The signing physician altered the document in what appears to be an attempt to backdate contributions that were not her own.

65. There were no exigent circumstances related to my situation that made emergency hospitalization procedures necessary.

66. I affirmatively sought treatment for my mental health concerns and voluntarily participated in a comprehensive mental health examination.

67. I was deemed to have the ability to exercise reasonable judgement regarding my medical care during the psychiatric examination.

68. I was interested in filing an application for voluntary admission under Section 5122.02 because I had concerns for my sleep.

69. I believe the emergency hospitalization procedures were invoked in bad faith, just so the hospital could bill my private insurance for my inpatient stay. This is based on a conversation I had with a Licensed Social Worker Sheena Bailey-Duncan about my lack of insurance coverage for voluntary hospitalization stay prior to the written statement being drafted, which was the only time a "pink slip" was affirmatively mentioned to me.

70. I was not made aware of the written statement's contents nor was I afforded an opportunity to contest it and correct my medical information to ensure the providers had an adequate understanding of my situation when deciding on a course of treatment.

71. The written statement also denied me the ability to submit a voluntary hospitalization application that would have given me an opportunity to explain my concerns, in my own words, in a manner that ensured a proper understanding of my situation and needs.

72. Shortly after I arrived to the Elyria Medical Center on January 15, 2023, it became apparent that my medical concerns were not going to be adequately addressed, so I requested to discharge but was refused.

73. I was informed by a nurse that I was required by law to stay, and a group of armed security guards responded to the unit to inform me of the same.

74. When I insisted that I was competent and asserted my right to consent to treatment, I was told my right to consent did not apply and I would not be released until after I saw a doctor.

75. When I requested information and inquired under what authority I was being held, my questions were diverted and I was simply told, "you can speak to the doctor about that."

76. I saw Dr. Jha the next day on January 16, 2023, in accordance with the twenty-four-hour requirement imposed by law, but he refused to immediately discharge me in accordance with his duty under 5122.01(E) and instead insisted that I needed to stay based on my risk of suicide, which I can only assume was improperly understood based on the information contained in the written statement.

77. I also assert that I was misled regarding the services and treatment available to me once arriving at the UH Elyria Medical Center, which if known or understood, would have materially impacted my willingness to go.

78. I was told there was a physician on staff that would be on-call and available to meet with me and discuss my medical needs after arrival.

79. However, the hospitalist was only available on weekdays, and he refused to meet with me in person and instead sent a CNP who was unprofessional, confrontational, unempathetic to my needs, and who forced me to participate in unnecessary medical diagnostic testing because she refused to allow outside x-ray images of my neck to be faxed to her.

80. I was told that I would be supported with appropriate pain medications that would allow for my stay to be comfortable.

81. However, the pain management doctor who came refused to provide me stronger pain medications because of a concern with "suicide ideation" a concern that was misrepresented and misunderstood in the context of the written statement's suggestion of prior suicide attempts.

82. My pain situation was so intolerable that I ended up requesting to "just be sedated," a request that was finally granted when a nurse agreed to provide medication "for agitation."

83. During my stay, I requested a toilet chair because the toilet in my room sat too low to the ground, and I knew squatting that low would aggravate the femoroacetabular impingements of my hips and cause me additional pain.

84. However, the chair was never delivered to me, instead, it remained just outside the unit and was walked past by every nurse and staff member entering and exiting the unit during my stay.

85. In addition to the indignity that I felt having to hold my bowels during the stay to prevent having to use the lower-than-average toilet, I have reason to suspect the refusal to provide me the chair may have been intentional. I had near constant disagreement with staff about my pain level, my condition, and my needs that made me feel this could have been deliberate or serving as punishment.

86. Despite my individualized treatment plan indicating my "acceptable pain level" was to be a "1" during my stay, my pain scores were consistently higher than a seven for the entirety of my stay, which made any treatment related to my mental health nonproductive and virtually non-existent.

87. At one point, out of sheer desperation, I called 911 in hopes that it would prompt a response and someone would become aware of my situation and offer to help, but that did not happen.

88. The recording from the call captures a nurse laughing at the situation, dismissing my concern, and describing me as "threatening" after being handed the phone.

89. This experience represents the most difficult experience in my life.

90. It was outrageous, preventable, and it resulted in me wanting to kill myself to escape— the very risk the treatment team was concerned about.

91. I had never in my life prior, and have not since being released, had a thought to end my life.[5]

92. Worse yet, I could not express my true feelings because I was afraid of retaliation and being held longer without having my needs met.

93. Since my release, I have continued to struggle to get treatment because I know that sharing my feelings and experience could result in my liberty being taken away—because the process lacks adequate safeguards to prevent improperly execution of these procedures, and mentally ill people suffer from inherent credibility issue.

94. I spent 12 weeks in 2023 bedridden, unable to walk following two hip operations, completely traumatized by my experience and afraid to seek help from the people refusing to discharge me.

95. In July, nearly six months after my discharge, I finally gathered the courage to check myself into an intensive partial hospitalization treatment program, where I was diagnosed with PTSD.

96. Today, I still have flashbacks, intrusive thoughts, nightmares, and severe anxiety related to my experience.

## **FOURTEENTH AMENDMENT VIOLATIONS**

96. The Fourteenth Amendment to the United States Constitution confers citizenship to persons born in the United States.

---

[5] I was provided a bag of toiletries that contained a roll-on deodorant and plastic toothbrush. I thought to myself that I could take that deodorant, place the can on the floor, and step on it to remove the applicator ball. Then, I could increase its size by tying a knot around the ball with a ripped sock. I figure I could then use my toothbrush to lodge the object deep into my throat to stop my breathing and end my suffering.

97. I was born in the State of Ohio, and therefore, I am a citizen of the United States.

98. As a citizen of the United States, I am entitled to the civil rights guaranteed by the United State Constitution including the right to due process under the Fourteenth Amendment when a liberty interest is at stake.

99. I assert my involuntary civil commitment to the UH Elyria Medical Center under Ohio's emergency hospitalization procedures constituted a substantial deprivation of my liberty within the meaning of the Due Process Clause of the Fourteenth Amendment.

100.  I assert all willing participants acting under the color of O.R.C. § 5122.10 are appropriately considered state actors for purposes of the Fourteenth Amendment.

101.  I assert 42 U.S.C. § 1983 expressly applies to any person who acts under the color of a state statute to deprive a citizen of his civil rights under the United States Constitution.

102.  As such, I assert Defendant Governor Mike DeWine in his official capacity as the Governor of Ohio, Defendant LeeAnne Cornyn in her official capacity as the Director of ODMHAS, Defendant Mr. Harrell, Defendant Dr. Grosso, Defendant Dr. Jha, and Defendant University Hospitals, all jointly and severally, are all responsible for depriving me of my liberty without due process of law for the reasons described in the three claims below.

<u>Facially Deficient Process</u>

103.  I assert Ohio's emergency hospitalization process is substantively and procedurally deficient in a manner that increases the risk of due process violations because:

104.  Emergency hospitalization procedures do not provide a process that adequately incorporate patient input, which prevents patients from recording, from their perspective, what mental health issues they are experiencing, if any, and their views on their treatment needs prior to them being taken into custody.

105.  Emergency hospitalization procedures do not provide a process that adequately communicates the legal nature of the written statements in a manner that distinguishes them from clinical determinations, which can create confusion about the appropriateness of the procedures. The invocation of O.R.C. § 5122.10 is a legal decision based on legal standards, it is fundamentally distinct from a

clinical decision, and failing to explicitly communicate that distinction increases the risk of improper decision-making.

106.  Emergency hospitalization procedures do not provide an adequately clear and standardized process for the clinical and legal components of written statements, which increases the risk of misinterpretation, mistakes, and insufficient substantiation that increases the risk of errors.

107.  Emergency hospitalization procedures do not provide a process that requires an adequate showing of exigency, which is a critical factor when determining whether immediate action using emergency hospitalization procedures are necessary when compared to judicial hospitalization, which provides more due process protections by allowing a court of law to determine whether probable cause exists to justify an arrest and detention of a suspected mentally ill person.[6]

108.  Emergency hospitalization procedures do not provide a process that requires an "oath or affirmation" or "acknowledgement" in the written statement, which would remind invocators of the legal nature of the proceeding and reaffirm their duty to provide only true and accurate information under penalty of law.

109.  Emergency hospitalization procedures do not provide a process that explicitly demands only reliable, competent and credible evidence, or first-hand knowledge be included in the written statement, which increases the risk of invocators including unreasonable and unreliable information.[7]

110.  Emergency hospitalization procedures do not provide a process that adequately segregates the duties associated with drafting and reviewing the written statement, which increases the risk of accountability issues, errors, abuses, and misuse of the process.

111.  Emergency hospitalization procedures do not provide a process that adequately informs invocators that "probable cause" is required to support the assertions made in the written statement, which can lead to subjective, unsubstantiated, and conclusory assertions serving as the basis for a civil arrest and detainment.

112.  Emergency hospitalization procedures do not provide a process that provides an automatic and timely judicial review provision of the written statement, which increases risk that a patient spends additional time in an unlawful detention.

---

[6] "[A]n [actor] may not initiate an emergency admission pursuant to R.C. 5122.10 unless he has reason to believe that the person represents a substantial risk of physical harm to himself or others if allowed to remain at liberty. R.C. 5122.11 does, however, provide an alternative procedure for initiating admission to a receiving hospital." See: OAG 79-021

[7] "While no Ohio court has opined on this issue, courts have held in various contexts that a person may have 'reason to believe' something exists even though he has no actual knowledge of its existence." See: OAG 79-021

113. Emergency hospitalization procedures do not provide a process that automatically informs the patient of the facts underlying their detention, which decreases the ability to confront and contest untrue and unsupported facts, which may materially and negatively impact their legal status and treatment plans.

114. Emergency hospitalization procedures do not provide a process that establishes appropriate and standardized review procedures to identify facially deficient written statements that do not comply with the mandatory legal requirements of O.R.C. § 5122.10, which increases the risk of wrongful detentions based on defective statements.

115. Emergency hospitalization procedures do not provide a process that establishes a relevant range for considering past conduct and risk, which results in a risk of old, stale, irrelevant, and inappropriate information influencing risk assessments.

116. Emergency hospitalization procedures do not provide a process that assigns a caseworker charged with advocating and assisting patients in having their treatment concerns considered, which increase the risk of suboptimal treatment outcomes that fail to ensure commitment bears some reasonable relation to the purposes for which the individual is committed.

117. Emergency hospitalization procedures do not provide a process that mandates specific due process training requirements for individuals authorized to invoke written statements, which increases the risk of traditionally "private" actors not appropriately understanding their "public function" in the context of executing the procedures, which includes the protection of due process rights when executing emergency hospitalization procedures.

118. Emergency hospitalization procedures do not provide a clearinghouse or other sufficient review mechanism for verifying the person invoking O.R.C. § 5122.10 is authorized by the law to do so, which increases the risk the power of the state being misappropriated.

119. Emergency hospitalization procedures do not provide a process that affirmatively and proactively reviews state procedures to determine whether deficiencies and inefficiencies exist, and instead requires procedural improvements to come from the judiciary, after harm has already occurred.

120. Emergency hospitalization procedures do not provide a process that adequately assists patients in the assertion of their rights, the filing of grievances and complaints, in a manner that ensures timely resolution, which increase the risk that unsuitable conditions persist the entirety of the patient's stay and impact treatment outcomes.

121.   Emergency hospitalization procedures do not provide an adequate process that assists patients in receiving an independent evaluation of the necessity and validity of the written statements, risking unchecked abuses or errors and compromising process integrity.

122.   Emergency hospitalization procedures do not provide an adequate process that requires the compulsory mental health examination to issue a report with its adjudicatory findings and conclusions, which is appropriate because the examination acts as a de-facto and non-judicial probable cause hearing.[8]

123.   Emergency hospitalization procedures do not provide a process that adequately outline a process that verifies a patient who cannot meet his basic physical needs because of a mental illness cannot have his needs met in the community, which increases improper detention under such grounds.

124.   Emergency hospitalization procedures do not provide a process that adequately identifies the suspected risk of harm if immediate action is not taken, which increases the risk that no risk of harm exists or is improperly overstated.

125.   Emergency hospitalization procedures do not provide a process that adequately informs patients of changes to their legal status, which increases the risk of detentions continuing after their legal authority has expired and patients being unsure of their rights.

126.   Emergency hospitalization procedures do not provide a process that automatically and immediately connect involuntary patients with an attorney following admission to determine whether they would like to challenge their detention in court.

127.   Emergency hospitalization procedures do not provide a process that specifies patients transported for a compelled examination should be transferred in accordance with the least restrictive means, which increases the risk that patients are inappropriately subjected to physical restraints while being transported to the hospital.

128.   Emergency hospitalization procedures do not require mandatory document retention policies for facilities involved in the detention and evaluation of patients under O.R.C Section 5122.10, which increases the risk of lost information critical to reviews of detention.

---

[8] It's worth noting the State of Ohio already provides such a procedure for judicial hospitalization procedures. See: O.R.C Section 5122.14.

129. Emergency hospitalization procedures do not require a certificate of attestation at the receiving hospital to ensure that the patient's medical chart has personally been reviewed by the treating physician or chief clinical officer prior to making a decision on the patient's status or accepting a patient for treatment.

130. I assert the common-sense nature of these missing safeguards, the prior statements of the Ohio Attorney General, the existence of similar safeguards in judicial hospitalization proceedings, and the fact that some of these deficiencies have been identified in previously-litigated cases suggests bad faith and willful or wanton conduct on behalf of the State of Ohio regarding these failures.

131. I assert authority vested in the Governor of the state, as the highest executive authority, which grants the Governor the power to oversee and execute the laws and regulations of the state. This authority is derived from the state's constitution and statutory provisions, establishing a direct link between the Governor's responsibilities and the alleged harm in this claim, as the Governor has the responsibility to ensure the proper functioning and administration of state government, including matters pertaining to the subject of this claim.

132. I assert authority vested in the Director of Mental Health and Addiction Services under O.R.C. § 5119.22 of the Revised Code, which empowers the Director to adopt rules necessary to carry out the purposes of Chapter 5122 of the Revised Code, establishes a direct link between the Director's responsibilities and the alleged harm in this count.

<u>Pink-Slip Violation</u>

133. On January 15, 2023, Mr. Harrell was a licensed physician assistant employed in the University Hospital emergency department at 11100 Euclid Avenue Cleveland, OH 44106.

134. That day, at approximately 10:59 AM, Mr. Harrell, a physician assistant licensed under O.R.C. Chapter 4730, authored a written statement with the intention of having me civilly arrested and sent to a hospital for a compelled psychiatric examination pursuant to O.R.C. § 5122.10.

135. The written statement consists of a three-page standardized form printed on University Hospital letterhead and has been included with this complaint as EXHIBIT B.

136. The written statement provides a structured presentation of patient information, includes legal references, uses legal terminology, and also contains authoritative statements, document timestamps, and detailed electronic signatures that identified the contributions of each signatory.

137.   Mr. Harrell's electronic signature was affixed to the written statement at 11:05 AM on January 15, 2023—a mere six minutes after the document was created.

138.   In that six-minute span, Mr. Harrell's signature indicates that he authored the Transfer, Application for Emergency Admission, Statement of Belief, and the Statement of Observation sections of the document.[9]

139.   The written statement was also electronically signed by licensed physician Dr. Grosso, who was a medical doctor licensed under O.R.C. Chapter 4731.

140.   Dr. Grosso's signature was affixed to the written statement at 3:20 PM on January 18, 2023, a full three days after I was transferred out of the emergency department.

141.   Despite the timestamps and signature blocks suggesting otherwise, Dr. Grosso's electronic signature claims that she authored the Statement of Belief section of the written statement.[10]

142.   The timestamps and signature blocks also indicate the text, "Printed Name: Riley Grosso, MD Date: 15 -Jan -2023" was added to the Statement of Belief by Dr. Grosso on January 18, 2023.

143.   I assert these "irregularities" reasonably suggest Dr. Grosso altered the written statement in an attempt to backdate contributions, contributions that were not her own, in order to fraudulently pass the document off as being executed by her in accordance with O.R.C. 5122.10 on January 15, 2023.

144.   I assert the written statement executed against me was facially invalid because it failed to appropriately identify the risk of releasing me; it failed to include information about the circumstances upon which I was taken into custody; it failed to incorporate true or reliable information; it failed to be timely executed by an authorized individual; it failed to reflect the beliefs of an authorized individual; it failed to substantiate its assertions and conclusions by providing facts; and as such, it failed to invoke actual authority under Ohio law.

145.   I assert that as a direct and proximate result of Mr. Harrell's and Dr's Grosso's actions in this process, I was placed in physical restraints and transported via ambulance to a psychiatric unit of the University Hospital's Elyria Medical

---

[9]The Statement of Observation section of the written statement was left blank, likely because neither Mr. Harrell nor Dr. Grosso were material participants in my treatment and neither personally assessed me.

[10] It is worth noting, the Statement of Belief section plainly states that it must to be filled out by a licensed physician, which may suggest the reason it was the only section Dr. Grosso claimed credit for authoring.

Center, where there was confusion regarding my situation, psychological condition, and the appropriateness of interventions for my medical needs.

146. I assert these failures are egregious and a properly-operating and competent review procedure should have identified these deficiencies and prevented the written statement from obtaining apparent authority under Ohio law.

147. I assert Defendant Mr. Harrell, Defendant Dr. Grosso, Defendant University Hospital were willing participants in the invocation of 5122.10 emergency hospitalization procedures and are properly understood to be state actors.

148. I assert University Hospital is liable under respondeat superior for the actions and omissions of its employees Mr. Harrell, Dr. Grosso, and is primarily liable as the organization responsible for overseeing its internal policies related to the administration of O.R.C. § 5122.10 at its place of business.

### Failure to Immediately Release

149. On January 16, 2023, I underwent an examination by Dr. Jha in accordance with O.R.C. Section 5122.10(E).

150. I assert Dr. Jha was the chief clinical officer of the psychiatric unit at the Elyria Medical Center.

151. I assert the chief clinical officer's role in this context was not to evaluate my condition from a clinical perspective for treatment purposes, but instead, his evaluation was conducted within the framework of state-defined legal definitions to determine whether my continued detention was justified under the law.

152. I assert the specificity and mandatory nature of O.R.C. Section 5122.10(E) superseded the exercise of typical professional judgment that a chief clinical officer might employ, and mandated strict compliance from Dr. Jha in executing his duties.

153. I assert Dr. Jha was a state actor willingly participating in this process.

154. I contend that, at the time of the examination, I did not meet the criteria outlined in O.R.C. Section 5122.01(A) or O.R.C. Section 5122.01(B), and I should have been immediately released following the examination in accordance with the law.

155. Due to Dr. Jha's failure to release me, I was subjected to involuntary hospitalization.

156.  This constituted an unlawful restraint of my liberty, directly violating the Due Process Clause of the Fourteenth Amendment.

Requested Relief

157.  I assert that the named Defendants individually and collectively are responsible for violating my right to liberty and due process rights in the context of my confinement, due to their actions and omissions related to the emergency hospitalization procedures that were invoked against me on January 15, 2023, as more accurately defined herein, which resulted in me being detained against my will.

158.  As such, I seek relief in the form of:

159.  A judgment declaring O.R.C. § 5122.10 facially and substantively invalid due to it not providing adequate due protections, in direct violation of the Fourteenth Amendment violations, thereby preventing its further misuse.

160.  An injunction preventing the use of O.R.C. § 5122.10 for civil arrests and searches until proper safeguards are implemented to ensure compliance with the traditional values associated with due process, as applied to a fundamental right.

161.  Compensatory damages in the amount $1,195,000 for the Facially Deficient Process claim.

162.  Compensatory damages in the amount $1,195,000 for the Pink-Slip Violation claim.

163.  Compensatory damages in the amount $1,195,000 Failure to Immediately Release claim

164.  Punitive damages as deemed appropriate by the Court.

165.  Any and all equitable relief, including incurred costs and any further relief the Court deems appropriate.

## **FOURTH AMENDMENT CHALLENGE**

166.  I hereby reassert and incorporate by reference the facts set forth herein, and assert the following claim against Defendant LeeAnne Cornyn in her official capacity as the Director of ODMHAS and Defendant Governor Mike DeWine in his official capacity as the Governor of Ohio.

167. I assert the procedures under O.R.C. § 5122.10, allowing for civil arrests and compelled psychiatric evaluations constitute Fourth Amendment searches and seizures based on the government function, the state involvement, state compulsion tests.

168. I assert all citizens have a reasonable expectation of privacy in their thoughts and mental processes and have a reasonable expectation to be free from self-certifying arrest warrants that threaten their personal security, privacy, and liberty interests.

169. I assert the written statements authorized by O.R.C. § 5122.10 are facially invalid because they violate the Fourth Amendment's warrant requirement.

170. I assert the written statements authorized by O.R.C. § 5122.10 are facially invalid because they violate the Fourth Amendment's reasonableness requirement.

171. I assert my injuries suffered after I was taken into custody, placed in physical restraints, transported to a psychiatric hospital, and held against my will provide me standing to challenge this statute.

172. I further assert that as a person living with a mental health diagnosis of post-traumatic stress disorder of, which there is no known cure, a favorable ruling on this claim would provide redress for my past injury and would reduce the risk of similar violations from occurring to me in the future.

173. As such, I seek relief in the form of:

174. A judgment declaring O.R.C. § 5122.10 facially invalid due to Fourth Amendment violations, thereby preventing its further misuse.

175. An injunction preventing the use of O.R.C. § 5122.10 for civil arrests and searches until proper safeguards are implemented to ensure compliance with the Fourth Amendment.

176. Any and all equitable relief, including incurred costs and any further relief the Court deems appropriate.

## ADA VIOLATION

177. I hereby reassert and incorporate by reference the facts set forth herein, and assert the following claim against Defendants University Hospital, Irene Fries, and Deb Gedridge, jointly and severally, for the damages alleged under this claim.

178. I was admitted to the psychiatric unit of Elyria Medical Center at 3:18 PM on January 15, 2023.

179. At that time, I suffered from bilateral femoroacetabular impingements (FAI) in my both hips causing significant pain with sitting and squatting.

180. I assert my condition was documented in my medical records and spoke about at-length with staff.

181. On January 15, 2023, I requested a raised toilet seat because the toilet in my room was exceptionally low.

182. I assert that despite my disability, I was otherwise qualified to use the toilet facilities in the psychiatric unit at Elyria Medical Center, which is a fundamental aspect of participation in any medical facility program.

183. I assert that my request for a raised toilet seat was made solely to mitigate the discomfort and pain associated with the toilet facilities, ensuring that I could engage in this essential daily activity without unnecessary suffering.

184. I assert that my request was documented by Registered Nurse Irene Fries and communicated to Supervisor Deb Gedridge.

185. Despite the documented need and communication, the accommodation was not provided for the entirety of my stay.

186. I assert the failure of Defendants to provide the necessary accommodation constitutes a violation of Title II of the ADA.

187. I assert the emotional distress caused by this failure was exacerbated by the frequent and inappropriate comments made to me by hospital staff questioning the legitimacy of my condition, the impact it had on my physical functioning, and the continued questioning of my pain symptoms, which were not done for treatment purposes.

188. As a direct and proximate cause of Defendants' actions, I experienced substantial physical pain when using the restroom and emotional distress due to avoiding bowel movements and being aware of the utter indifference of the staff to my needs.

189. I assert the deliberate indifference of Defendants Gedridge and Fries, as evidenced by their knowledge of my disability and the necessity for accommodation, satisfies the standard for discriminatory intent required for compensatory damages under Title II of the ADA.

190. I assert University Hospital is liable under respondeat superior for the actions of its employees, Gedridge and Fries.

191. As such, I seek relief in the form of: compensatory damages in the amount $1,195,000; punitive damages as deemed appropriate by the Court; and, any and all equitable relief, including incurred costs and any further relief the Court deems appropriate.

### CLAIM OF IIED

192. I hereby reassert and incorporate by reference the facts set forth herein, and assert that Mr. Harrell's and Dr. Grosso's material participation in preparing and executing a fabricated written statement against me was action taken in bad faith, with the intention of having me civilly arrested, sent to a hospital for a compelled psychiatric evaluation, and held in involuntary detention represents extreme and outrageous conduct that has caused me harm.

193. Under the doctrine of respondeat superior, Defendant University Hospitals is vicariously liable for the actions of Mr. Harrell and Dr Grosso's that occurred within the scope of his employment or were done to facilitate or promote the business of his employer.

194. Mr. Harrell's and Dr's Grosso's actions were deliberately and intentionally taken with reckless disregard for the impact it would have on my short and long-term health, my ability to receive adequate and appropriate treatment, and my relationships with medical providers.

195. I assert that as a direct and proximate result of Mr. Harrell's and Dr's Grosso's extreme and outrageous conduct, I was placed in physical restraints and transported via ambulance to a psychiatric unit of the University Hospital's Elyria Medical Center, where there was confusion regarding my medical needs, psychological condition, the appropriateness of interventions for my medical needs.

196. As a direct and proximate result of Mr. Harrell's and Dr's Grosso's egregious conduct, I suffered harm that included economic harm, severe psychological distress, and serious emotional anguish.

197. As such, I seek relief in the form of monetary damages of $1,195,000 punitive damages, and any other relief this Court deems just and proper.

## MEDICAL BATTERY

198.  I hereby reassert and incorporate by reference the facts set forth herein, and, and assert that Mr. Harrell's and Dr. Grosso's material participation in preparing and executing a fabricated written statement against me was action taken in bad faith, with the intention of having me civilly arrested, sent to a hospital for a compelled psychiatric evaluation.

199.  Under the doctrine of respondeat superior, Defendant University Hospitals is vicariously liable for the actions of Mr. Harrell and Dr Grosso that occurred within the scope of their employment or done to facilitate or promote the business of their employer.

200.  As a direct and proximate result of Mr. Harrell's Dr. Grosso's actions, I was placed in physical restraints and transported via ambulance to the psychiatric unit of the Elyria Medical Center without a clear understanding of my legal status or how that status may impact my treatment and ability to secure release.

201.  I assert the action of being placed in physical restraints was a harmful and offensive touching that offends a reasonable sense of personal dignity.

202.  I assert that I did not consent to this harmful and offensive touching.

203.  I assert that as a direct result of this harmful and offensive touching, I have experienced severe psychological distress that includes anxiety, flashbacks, and ruminations related to the experience, and have suffered economic damage.

204.  As such, I seek relief in the form of monetary damages of $1,195,000, punitive damages, and any other relief this Court deems just and proper.

## FALSE IMPRISONMENT

205.  I hereby reassert and incorporate by reference the facts set forth herein, and assert that Mr. Harrell's and Dr. Grosso's material participation in preparing and executing a fabricated written statement against me was action taken in bad faith, with the intention of having me civilly arrested, sent to a hospital for a compelled psychiatric evaluation, and held in involuntary detention.

206.  Under the doctrine of respondeat superior, Defendant University Hospitals is vicariously liable for the actions of Mr. Harrell and Dr. Grosso that occurred within the scope of his employment or were done to facilitate or promote the business of his employer.

207.   I assert their action was taken without lawful privilege on January 15, 2023 when they intentionally and improperly executed a 5122.10 written statement to have me arrested, detained, and confined to a controlled-access psychiatric hospital against my will.

208.   I assert that as a direct and proximate result of their action, I have experienced severe psychological distress that includes anxiety, flashbacks, and ruminations related to the experience, and have suffered economic damage.

209.   Wherefore, I seek relief in the form of monetary damages of $1,195,000, punitive damages, and any other relief this Court deems just and proper.

## FALSE IMPRISONMENT II

210.   I hereby reassert and incorporate by reference the facts set forth herein, and assert the following claim against Dr. Jha.

211.   Under the doctrine of respondeat superior, Defendant University Hospitals is vicariously liable for the actions of Dr. Jha that occurred within the scope of his employment or were done to facilitate or promote the business of his employer.

212.   I assert on January 16, 2023, I was examined in accordance with O.R.C. § 5122.10(E).

213.   I assert that I did not meet the definitions found in O.R.C. § 5122.01(A) or O.R.C. § 5122.01(B), and therefore was required to be immediately released by the chief clinical officer following the examination in accordance with O.R.C. § 5122.10(E).

214.   I further assert it was unreasonable to believe I met the criteria of O.R.C. § 5122.01(A) or O.R.C. § 5122.01(B) because I was assessed using the Columbia Suicide Severity Rating Scale (C-SSRS) a total of Eight times between January 14, 2023 and January 18, 2023, every single assessment states that I had never in my lifetime "done, started to do, or prepared to do" anything to end my life.

215.   Furthermore, the results of the assessments consistently indicate my suicide risk as being "low" and my pain being "severe."

216.   As a direct and proximate cause of the chief clinical officer's failure to release me, I was subjected to involuntary hospitalization, and confined to the psychiatric unit at Elyria Medical Center.

217.   I assert the actions and omission taken by Dr. Jha were not consented to or privileged, as he had an affirmative duty to release me.

218. I assert that as a direct and proximate result of their action, I have experienced severe psychological distress that includes anxiety, flashbacks, and ruminations related to the experience, and have suffered economic damage.

219. Wherefore, I seek relief in the form of monetary damages of $1,195,000, punitive damages, and any other relief this Court deems just and proper.

## EQUAL PROTECTION

220. I hereby reassert and incorporate by reference the facts set forth herein, and assert the following claim against Defendant LeeAnne Cornyn in her official capacity as the Director of ODMHAS and Defendant Governor Mike DeWine in his official capacity as the Governor of Ohio.

221. Article I, Section 16 of the Ohio Constitution states, "all courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."

222. I contend that the release procedures related to inpatient hospitalization (voluntary, judicial, and emergency alike) unjustifiably discriminate against individuals with mental illness by prescribing mandator release procedures that work to circumvent or delay access to courts, resulting in due process violations for mentally ill persons in the state.

223. I maintain that in the state of Ohio, individuals accused of a crime are entitled to a timely judicial review of their detention. However, individuals accused of having a mental illness can be held for an extended period before undergoing such a review.

224. Criminals in the state also have the benefit of challenging their charging documents and being aware of the allegations made against them. It is my contention that it violates the principle of equal protection to treat individuals with mental illness worse than criminals when the same rights are at stake, especially under the pretext of treatment.

225. I further assert that the Ohio General Assembly cannot disregard decades of judicial precedent by establishing an entirely different system, particularly one that allows private enterprises motivated by revenue to significantly participate without adequate oversight, thus jeopardizing the rights of citizens.

226.   As such, I request:

227.   Mentally ill persons in the State of Ohio be treated with the same rights as criminals in the state.

228.   Any and all equitable relief, including incurred costs and any further relief the Court deems appropriate.

PO Box 470039

Bradview Heights,

OH, 44147